Clarence TROSPER

v.

**ARMSTRONG WOOD PRODUCTS, INC.**

Supreme Court of Tennessee, at Knoxville.

Assigned on Briefs Sept. 11, 2008.

Dec. 30, 2008.

Linda J. Hamilton Mowles, Knoxville, Tennessee, for the appellee, Armstrong Wood Products.

C. Patrick Sexton, Oneida, Tennessee, for the appellant, Clarence Trosper.

## OPINION

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, J., and FRANK F. DROWOTA, III, Sp.J., joined. WILLIAM C. KOCH, JR., J., dissenting.

Following surgeries on both of his hands, the employee filed suit seeking workers' compensation benefits on the theory that the repetitive nature of his work in the employer's flooring business exacerbated a pre-existing, but dormant, arthritic condition. The trial court found that the employee's work duties had worsened his osteoarthritis and awarded 40% permanent partial disability to each hand. The trial court also awarded temporary total disability benefits for the time during which the employee was recuperating from the surgeries and unable to work. The Special Workers' Compensation Appeals Panel reversed the trial court, holding that the employee's condition was neither caused nor aggravated by the work he performed for the employer. Because the evidence does not preponderate against the trial court's finding of causation and the award of benefits, we reverse the decision of the Appeals Panel and affirm the judgment of the trial court.

### Facts and Procedural History

Clarence Trosper ("Employee"), age sixty-four at the time of trial, holds a Graduate Equivalence Diploma and earned a welding certificate from a trade school. His work history includes three years of military service, nine years employment as a press operator making springs for mattresses, and twenty years as a welder for a coal mining business.

In 1993, the Employee accepted employment with Armstrong Wood Products

("Employer"), a manufacturer of flooring products. For the first four years of his tenure there, the Employee operated sanding and sawing equipment inside the plant. In 1997, he was assigned to work outdoors, removing heavy boards by hand rapidly, and continuously from a conveyor, sorting them, and then stacking them by grade. The boards ranged in size from sixteen to twenty feet in length and six to fourteen inches wide. In his new assignment, the Employee, who had never before experienced any problems with either hand, developed intense pain in both of his hands, particularly at the base of his thumbs near his wrist. He reported the occurrence to his supervisor and received medical treatment for the pain, including an injection near the base of one of his thumbs. The symptoms worsened after the injection.

When the Employee asked to return to a position inside the plant which involved less stress on his hands, the Employer agreed, transferring him to a job which entailed moving and stacking veneer. The Employee performed his new assignments capably and did not experience any further difficulty until 2000 or 2001, when he was transferred to a position which required him to lift forty-five to seventy pound buckets to shoulder level and then pour the chemical contents into a hopper. As he used his thumbs to grasp the wire handles on the buckets, he experienced a "real sharp pain" during each lift. His new responsibilities also required filling approximately 100 empty tubes an hour with wood filler and then labeling and packaging the tubes.

In 2004, after returning to work from a knee operation unrelated to this claim, the Employee again experienced pain in his hands from lifting the buckets of chemi-

cals. He reported this problem to his supervisor and asked if the buckets could be made lighter. The weight of the buckets was not reduced, and the Employer instructed the Employee to consult with Dr. Cletus McMahon, the physician who had performed the knee surgery. Dr. McMahon diagnosed the Employee with bilateral carpometacarpal osteoarthritis, a joint disease characterized by the degeneration of cartilage in the joints of the hands, specifically at the base of the thumb near the wrist.[1] Dr. McMahon performed a surgical fusion of the joint at the base of the Employee's thumb in his right hand on October 29, 2004. When the Employee returned to the same position, however, he experienced pain in his left hand, necessitating a surgical fusion of the affected joint in June of 2005. Afterward, the Employee retired, having completed twelve years of service to the Employer.

At trial, the Employee testified that he could no longer fully extend his thumbs, had trouble making a pinching motion, had diminished grip strength, and had continuous pain in his hands. He also stated that his condition required that he forego some of his hobbies, such as hunting, fishing, and gardening. He could not use a weed eater or a chain saw as he had done in the past.

After the Employee's second surgery, Dr. William Kennedy, an orthopedic surgeon, performed an independent medical evaluation on the Employee. The Employee informed Dr. Kennedy that he began to experience pain, numbness, and tingling in both of his hands for the first time in 1997 and 1998 while sorting and stacking lumber for the Employer. He reported that since his 2004 and 2005 surgeries,

---

1. Osteoarthritis, a fairly common type of arthritis, "is accompanied by pain and stiffness" in the affected joint, "particularly after pro-longed activity." *Dorland's Illustrated Medical Dictionary* 1197 (27th ed.1988).

he has continued to have pain in both thumbs and complained that he had not regained normal strength or range of motion in either hand. Furthermore, the Employee experienced difficulty gripping and maneuvering small objects while doing ordinary tasks, such as brushing his teeth, combing his hair, bathing, or preparing food.

Based upon the examination, which included a review of x-rays taken before and after the surgeries, Dr. Kennedy concluded in his deposition that the Employee had severe osteoarthritis in both of his thumbs. According to Dr. Kennedy, the Employee's arthritic condition "more likely than not . . . existed as a disease process" prior to his 1997 work stacking lumber, although the condition was "dormant" until he undertook those job responsibilities. While conceding that repetitive activity is not a cause of osteoarthritis itself, it was his opinion that the "cumulative trauma" of the Employee's work duties aroused the condition "from dormancy into a regularly painful reality." Dr. Kennedy further opined that the nature of the Employee's job "permanently aggravated and advanced [the] pre-existing, underlying carpometacarpal osteoarthritis in both of his thumbs and caused the painful instability of those joints which ultimately necessitated" the surgeries in 2004 and 2005. It was also his opinion that the "cumulative trauma" of the Employee's work made the surgeries necessary and the osteoarthritis "would not have been advanced or aggravated to the extent that it was" but for his work activities. When asked what he meant by "aggravated," Dr. Kennedy responded that the Employee's duties "caused a . . . change in the biomechanics of the thumb by gradually stretching and loosening the ligaments that hold the base of the thumb in proper position, and by gradually and increasingly damaging, dis-rupting, and thinning" the cartilage between the bones.

Dr. Kennedy, whose testimony was extensive relative to the other doctors who testified, specifically attributed the Employee's diminished ability to spread his thumbs apart from his hands "to the injuries that he had suffered to the bases of both of his thumbs." It was his assessment that the stacking of lumber had "continued to aggravate and advance the subluxation or partial dislocation and osteoarthritis of both of his thumbs." When asked to state the effect of repetitively lifting the buckets of chemicals during the last several years of his employment, Dr. Kennedy responded that such activity "would have increased the forces conducted through the bases of his thumbs and would reasonably have been expected to aggravate and advance the osteoarthritis." Dr. Kennedy also believed that the surgical fusion of the joints in the Employee's thumbs "increased the normal biomechanical forces" in his thumbs, making him more vulnerable to injury. Finally, Dr. Kennedy assigned anatomical impairments of 8% to each hand, and recommended that the Employee permanently avoid "vigorous pushing or pulling, or rapid, repeated motions with either of his hands." It was his opinion that the Employee could not "carry out maximum gripping or pinching with either hand," or, with the use of two hands, lift or carry twenty pounds occasionally or ten pounds frequently, or lift or carry five pounds with one hand.

Dr. Brantley Burns, also an orthopedic surgeon, likewise conducted an independent medical examination of the Employee. He concurred in the diagnosis of osteoarthritis, and testified by deposition that causation was "probably a combination of things. [While i]t certainly has a large genetic component to it . . . any activity

that you do can ... worsen [the] problem to the point of needing some treatment." He explained that "all and any" activity, including work, would cause the condition to worsen.

Dr. Ronald Fadel, an orthopedic physician who no longer performs surgery, reviewed the Employee's medical records on behalf of the Employer. Unlike the other two physicians, Dr. Fadel did not actually examine the Employee. He testified by deposition that the cause of osteoarthritis, which he described as common for those in "the sixth and seventh decades of life, regardless of work activity," is unknown. It was his opinion that there was "no known relationship" between repetitive use of the hands and the development of the disease. Dr. Fadel testified that "activities of daily living [are] as likely to produce this disease in one person as it is in another." In this regard, he disagreed with Dr. Kennedy's conclusion that the Employee's work aggravated his pre-existing arthritic condition. Dr. Fadel conceded, however, that had he actually treated the Employee, he "would understand more of his disease and what's going on in the process."

Dr. Norman Hankins, a vocational evaluator, testified that the Employee's IQ was in the "low/average range," and that he could read at a fifth grade level. According to Dr. Hankins, the Employee possessed math skills at the seventh grade level. Dr. Hankins assessed a vocational disability of 82% to the hands.

The trial accredited the testimony of the Employee, finding that his underlying osteoarthritis was worsened and advanced by his work activities, necessitating the fusion surgeries on the base of his thumbs. The trial court awarded 40% permanent partial disability to each hand, plus temporary total disability benefits for the periods of time that the Employee was off work recuperating from the surgeries on his hands.[2] By awarding benefits, the trial court gave greater credence to the deposition testimony of Dr. Kennedy, observing that "Dr. Kennedy says that there is causation," and "the other [D]octor [Fadel] says there is not." The Employer appealed, first contending that the trial court erred by finding that the Employee had suffered a compensable aggravation of his pre-existing osteoarthritis; and second, challenging the award of temporary total disability benefits. Finally, the Employer maintained that the award of 40% to each hand was excessive.

The Special Workers' Compensation Appeals Panel concluded that the osteoarthritis in the Employee's hands was not caused or aggravated by the work he performed for the Employer and, therefore, that the trial court had erred by awarding any benefits. In reaching this conclusion, the Panel observed that all of the physicians agreed that the underlying condition itself was not caused by the employment, and that the disease, by its nature, is progressive. The Panel specifically relied on the opinion of Dr. Fadel that there was no relationship between work activities and the development or advancement of osteoarthritis. We granted the Employee's request for full Court review in order to address these important issues.

## Standard of Review

■ We review the judgment of the trial court in workers' compensation cases "de novo upon the record ... accompanied by a presumption of the correctness of the

2. The employee was absent from work due to the first hand surgery from November 6, 2004, to February 11, 2005. He missed work from June 24, 2005, to October 30, 2005, for the second hand surgery.

finding, unless the preponderance of the evidence is otherwise." Tenn.Code Ann. § 50–6–225(e)(2) (2008). In such cases, the reviewing court must conduct an in-depth examination of the trial court's factual findings and conclusions. *Wilhelm v. Krogers,* 235 S.W.3d 122, 126 (Tenn.2007). When the trial court has seen and heard the witnesses, considerable deference must be afforded any factual determinations. *Tryon v. Saturn Corp.,* 254 S.W.3d 321, 327 (Tenn.2008). The same deference need not be afforded findings based upon documentary evidence, such as depositions. *Glisson v. Mohon Int'l, Inc./Campbell Ray,* 185 S.W.3d 348, 353 (Tenn.2006). Indeed, where medical testimony is presented by deposition, this Court may independently assess the medical proof to determine where the preponderance of the evidence lies. *Crew v. First Source Furniture Group,* 259 S.W.3d 656, 665 (Tenn. 2008). Reviewing courts afford no presumption of correctness to any conclusions of law. *Perrin v. Gaylord Entm't Co.,* 120 S.W.3d 823, 826 (Tenn.2003). Nevertheless, the testimony of expert witnesses must be considered in conjunction with the testimony of an employee as a lay witness. *Thomas v. Aetna Life & Cas. Co.,* 812 S.W.2d 278, 283 (Tenn.1991).

### Applicable Law

Any employee seeking to recover workers' compensation benefits must prove that the injury both arose out of and occurred in the course of the employment. *See* Tenn.Code Ann. § 50–6–102(12) (2008). "The phrase 'arising out of' refers to the cause or origin of the injury and the phrase 'in the course of' refers to the time, place, and circumstances of the injury." *Crew,* 259 S.W.3d at 664. An injury arises out of employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury. *Fritts v. Safety Nat'l Cas. Corp.,* 163 S.W.3d 673, 678 (Tenn. 2005). Except in the most obvious cases, causation must be established by expert medical evidence. *Glisson,* 185 S.W.3d at 354. Although evidence of causation may not be speculative or conjectural, "absolute medical certainty is not required, and reasonable doubt must be resolved in favor of the employee." *Id.* Accordingly, "benefits may be properly awarded to an employee who presents medical evidence showing that the employment could or might have been the cause of his or her injury when lay testimony reasonably suggests causation." *Id.;* see also *Fitzgerald v. BTR Sealing Sys. N. Am.—Tenn. Operations,* 205 S.W.3d 400, 404 (Tenn.2006).

Equally well-settled is the principle that an employer takes an employee "as is" and assumes the responsibility of having a pre-existing condition aggravated by a work-related injury which might not affect an otherwise healthy person. *Hill v. Eagle Bend Mfg. Inc.,* 942 S.W.2d 483, 488 (Tenn.1997). Thus, an employer is "liable for disability resulting from injuries sustained by an employee arising out of and in the course of his employment even though it aggravates a previous condition with resulting disability far greater than otherwise would have been the case." *Baxter v. Smith,* 211 Tenn. 347, 364 S.W.2d 936, 942–43 (1961). Tennessee law likewise recognizes that a worker may sustain a compensable gradual injury as the result of continual exposure to the conditions of employment. *See Cent. Motor Express, Inc. v. Burney,* 214 Tenn. 118, 377 S.W.2d 947, 948–50 (1964). In other words, unlike in some other jurisdictions, there is no requirement that the injury be traceable to a definite moment in time or triggering event in order to be compensable.

However firmly implanted the principle may be that an employer must bear the risk of aggravation of an employee's pre-existing condition, the precise contours of the rule have not always been articulated in a consistent manner. We recently stated in *Barnett v. Milan Seating Systems:*

> Under Tennessee law, when a plaintiff suffers from a pre-existing condition, a claim is not compensable when the employment does not cause an actual progression or aggravation of the underlying injury. If the employment causes an increase in pain with no corresponding permanent anatomical change, then there is no new compensable injury.

215 S.W.3d 828, 835 (Tenn.2007) (citations omitted). This description of the law finds its origin in cases that denied compensation because the work injury only made the pain of the pre-existing condition worse, but did not otherwise advance or progress the condition or result in any other disabling condition. *See, e.g., Townsend v. State,* 826 S.W.2d 434, 436 (Tenn. 1992); *Smith v. Smith's Transfer Corp.,* 735 S.W.2d 221, 225–26 (Tenn.1987). It is notable that none of these cases used the "anatomical change" terminology, although numerous subsequent opinions of the Workers' Compensation Appeals Panel have done so.

■ There is also a long history of cases in Tennessee establishing that there is "no doubt that pain is considered a disabling injury, compensable when occurring as the result of a work-related injury." *Talley v. Va. Ins. Reciprocal,* 775 S.W.2d 587, 592 (Tenn.1989) (citing *Boling v. Raytheon Co.,* 223 Tenn. 528, 448 S.W.2d 405, 407 (1969)). Following this guiding principle, we have held that "[a]n employer is responsible for workers compensation benefits ... if employment causes an actual progression or aggravation of the prior disabling condition or

disease which produces increased pain that is disabling." *Hill,* 942 S.W.2d at 488; *see also White v. Werthan Indus.,* 824 S.W.2d 158, 160–61 (Tenn.1992) (upholding award of compensation to employee with pre-existing back condition where a fall at work rendered him "virtually immobilized by pain," even though the medical expert "could not express a medical opinion as to increased anatomical injury").

The confusion in this area has manifested itself in cases such as this, which involve the aggravation of pre-existing arthritic conditions. In *Cunningham v. Goodyear Tire & Rubber Company,* 811 S.W.2d 888 (Tenn.1991), for example, an employee sought to recover for the aggravation of his pre-existing osteoarthritis. As in the present case, the underlying condition was asymptomatic until the employee started performing "hard labor" for the employer. *Id.* at 890. The medical evidence showed that while the cause of osteoarthritis was unknown, strenuous physical activity could exacerbate the condition. *Id.* Cunningham, whose job required him to lift and carry heavy objects, became physically disabled to the point of requiring the use of a wheelchair. Despite the acceleration of his osteoarthritis to such a debilitating extent, along with physical changes to his joints documented by x-rays, he was denied benefits. Citing to *Smith's Transfer,* the majority found that Cunningham's work duties aggravated his pre-existing condition by making the pain worse, but it did not otherwise advance the severity of his osteoarthritis. *Id.* at 891. The Court held that "[w]here the employment does not cause an actual progression or aggravation of the underlying disease, but simply produces additional pain, there is substantial authority that a claim is not compensable when the disease itself ... originated in conditions outside the employment." *Id.* at 890.

In dissent, Justice Martha Craig Daughtrey observed that the majority had properly concluded that work injury causing a mere increase in pain is not compensable. *Id.* at 891 (Daughtrey, J., dissenting). However, she criticized the majority for only applying the first part of the rule from *Smith's Transfer. Id.* The second part of that rule permits recovery when the work injury advances the severity of the condition, or results in a disabling condition other than increased pain. *Id.* (citing *Smith's Transfer,* 735 S.W.2d at 225–26). Justice Daughtrey opined that because Cunningham became "the victim of virtually complete physical debilitation, as the result of osteoarthritis aggravated by the conditions of his employment," there was "simply no way to conclude that [he] was suffering from merely an 'increase in pain.'" *Id.* at 894.

Subsequent to *Cunningham,* benefits have been awarded for the aggravation of pre-existing arthritic conditions. For example, in *Sweat v. Superior Industries, Inc.,* 966 S.W.2d 31 (Tenn.Workers Comp.Panel 1998),[3] the Appeals Panel affirmed the trial court's finding that the employee's pre-existing arthritis was aggravated by his employment. As in this case, Sweat had no symptoms of the disease until after he began working for the employer. Likewise, a physician testified that his work activities "advanced and resulted in actual progression of his underlying" arthritic condition. *Id.* at 32. Although another doctor expressed the view that Sweat's job activities were unrelated to his condition, the Appeals Panel emphasized that he was asymptomatic prior to performing the tasks assigned by the employer. The Appeals Panel also observed

that "[t]here being no way [to] quantify how much worse his condition was made by his work, . . . the employer must bear the burden of any uncertainty." *Id.* at 34.

More recently, in *Mathenia v. Milan Seating Systems,* 254 S.W.3d 313 (Tenn.Workers Comp.Panel 2007), our Appeals Panel once again affirmed an award of benefits where the employee aggravated pre-existing osteoarthritis in her thumb. Although the physicians agreed that Mathenia had osteoarthritis that pre-dated her employment, they differed as to whether her work activities aggravated the condition. One physician testified that "while her work and activities might have caused her an increase in her discomfort, I'm unaware of any specific anatomic change that would have either caused or aggravated that condition." *Id.* at 316. A second physician, however, testified that if she was completely pain free prior to her work injury, and otherwise experienced no symptoms of arthritis, "I would suspect that the injury at work may have caused her problem." *Id.* at 319. He added that Mathenia's work "could have initially caused some damage to the joint that over time, symptoms started occurring and with an arthritic joint, usually repetitive activity or stress through that area, will cause discomfort and pain." *Id.* Finally, a third physician testified that "[t]here is no way to know [whether [Mathenia's] work caused anatomical change] except that we know that to have increased pain, something has to change anatomically to cause that pain . . . and so on that basis, a good argument could be made by inductive reasoning that there has been some change." *Id.* Based on this evidence, the Appeals

**3.** Opinions of the Supreme Court's Special Workers' Compensation Appeals Panel may be published in the official reporter by order of a majority of the Court. Tenn. Sup.Ct. R. 4(A)(3). Published opinions "shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction." Tenn. Sup.Ct. R. 4(G)(2).

Panel affirmed the award of benefits to the employee.

 In light of these disparate results under similar circumstances, we are resolved to provide some clarity for the trial courts. We believe that our holding in *Smith's Transfer*, which we have cited with approval on numerous occasions, *see, e.g., Townsend,* 826 S.W.2d at 436, provides the proper framework where an employee seeks compensation on the grounds that a work injury has aggravated a pre-existing injury or condition. We reiterate that the employee does not suffer a compensable injury where the work activity aggravates the pre-existing condition merely by increasing the pain. However, if the work injury advances the severity of the pre-existing condition, or if, as a result of the pre-existing condition, the employee suffers a new, distinct injury other than increased pain, then the work injury is compensable.

## Analysis

 Guided by these principles, we turn to our analysis of the circumstances of this case. The Employer insists that the Panel's opinion reversing the judgment of the trial court should be affirmed because the evidence failed to establish a causal connection between the Employee's work activities and any aggravation of the pre-existing arthritic condition. More specifically, the Employer argues that to the extent the Employee's work activities have aggravated his underlying condition, they have caused only an increase in pain which, as we have acknowledged, is not by itself a compensable injury.

The issue here, of course, is not whether the Employee's job responsibilities caused his bilateral carpometacarpal osteoarthritis. The medical evidence demonstrates that it did not. Rather, the dispositive question is whether the Employee's work caused only an increase in the severity of his pain, such that he should be deprived of benefits. The trial court, which accredited the lay testimony of the Employee as to the nature of his injuries, did not believe so, and neither do we.[4]

Although the medical evidence is conflicting, which is not unusual in litigation of this nature, we cannot say that the trial court erred by accrediting the testimony of Dr. Kennedy. Based upon his examination and testing of the Employee, as well as his review of the medical records, including x-rays taken before and after the surgeries, Dr. Kennedy concluded that the Employee had severe osteoarthritis in both of his thumbs, and that the cumulative trauma of his work aroused the condition "from dormancy into a regularly painful reality." Dr. Kennedy further determined that the Employee's work activities "permanently aggravated and advanced [the] pre-existing, underlying carpometacarpal osteoarthritis in both of his thumbs and caused the painful instability of those joints which ultimately necessitated" the surgeries in 2004 and 2005. Dr. Kennedy observed that it was more likely than not that the job responsibilities necessitated the surgeries, and that the osteoarthritis "would

4. In *Williams v. Tecumseh Products Co.,* 978 S.W.2d 932, 935 (Tenn.1998), we held an employee's "very credible testimony," as determined by the trial court, "bolstered the medical evidence of causation. Given this determination of credibility and the trial court's careful review of the medical evidence, we cannot say that the evidence preponderates against the trial court's finding...." Further, "an award may be based upon medical testimony that [the employment] 'could be' the cause of the employee's injury, when there is also lay testimony from which it reasonably may be inferred that the [employment] was in fact the cause of the injury." *Resser v. Yellow Freight Sys., Inc.,* 938 S.W.2d 690, 692 (Tenn.1997).

not have been advanced or aggravated to the extent that it was" but for his activities at work. When asked what he specifically meant by "aggravated," Dr. Kennedy explained that the job duties gradually stretched and loosened the thumb ligaments and over a period of time caused a deterioration of the cartilage between the bones.

In addition, Dr. Kennedy attributed the Employee's diminished ability to spread his thumbs apart from his hands "to the injuries that he had suffered to the bases of both of his thumbs." It was his opinion that there were times when the Employee's work responsibilities sorting and stacking lumber "aggravate[d] and advance[d] the subluxation or partial dislocation and osteoarthritis of both of his thumbs." When asked to state the effect on his condition of repetitively carrying the buckets of chemicals over a several year period, Dr. Kennedy responded that such activity "would have increased the forces conducted through the bases of his thumbs and would reasonably have been expected to aggravate and advance the osteoarthritis." He also believed that the surgical fusion of the joints in the Employee's thumbs "increased the normal biomechanical forces" in his thumbs, making him more vulnerable to injury. Finally, he assigned anatomical impairments of 8% to each hand, and recommended that the Employee permanently avoid "vigorous pushing or pulling, or rapid, repeated motions with either of his hands." Moreover, Dr. Kennedy opined that the Employee could not "be expected to carry out maximum gripping or pinching with either hand," or lift or carry twenty pounds occasionally, ten pounds frequently with two hands, or five pounds with one hand. Restrictions such as these, of course, are significant for a person who has spent his working years performing manual labor.

Although Dr. Fadel, in particular, disagreed with Dr. Kennedy's conclusion that the Employee's work aggravated his pre-existing arthritic condition, he did concede that if he had actually treated the Employee he "would understand more of his disease and what's going on in the process." Unlike Dr. Kennedy, Dr. Fadel never examined the Employee. Dr. Burns' testimony was not particularly helpful to either side. He acknowledged, however, that the Employee's job responsibilities, along with other activities, would cause the arthritic condition to worsen. Our examination of the record confirms that Dr. Kennedy's findings, which were based not only upon his own administration of tests but also his first-hand observations of the Employee, were more detailed than that of the other physicians who testified. He specifically described anatomical changes in the hands that he attributed to the nature of the work.

As stated, an employer takes every employee "as is." *Hill*, 942 S.W.2d at 488; *see* 82 Am.Jur.2d *Workers' Compensation* § 300 (2008). Further, an injury may be compensable whether sudden or gradually developed over time. *Burney*, 377 S.W.2d at 948–50. Absolute certainty is not required in a workers' compensation claim; benefits may be awarded where the medical evidence suggests that the employment may have been the cause of injury and there is also lay testimony, particularly if it is corroborative of a medical opinion rendered by deposition, from which causation may be inferred. *See Crew*, 259 S.W.3d at 664–65. Thus, the Employee's testimony merits consideration. One of his assignments was to work outdoors—rapidly and continuously removing heavy boards by hand from a conveyor and sorting and stacking them by grade. It was during this time that he first began to develop any pain in either hand. Later,

his assigned responsibilities required him to lift forty-five to seventy pound buckets to shoulder level. The wire handles on the buckets rested directly on his thumbs, causing "sharp pain" with each lift. That his job duties required him to fill approximately 100 empty tubes with a chemical filler each hour of an eight-hour shift is not in dispute. The Employee also testified, without contradiction, as to the extent of his limitations, stating that at the time of trial he could not fully extend his thumbs, had trouble making a pinching motion, and had diminished grip strength. Because of continuing pain in his hands, he could no longer perform ordinary outdoor chores, hobbies, or simple tasks such as grooming his hair or brushing his teeth. His medical history corroborates that he first experienced the pain, numbness, and tingling in both of his thumbs when he was required to stack heavy boards, thus lending support to the medical assessment by Dr. Kennedy.

■ Based upon our independent review of the medical depositions and the other proof offered at trial, we are persuaded that the evidence does not preponderate against the finding of the trial court that the Employee suffered a compensable injury to his hands. Although the evidence of causation is particularly close, the lay testimony in conjunction with the medical evidence is sufficient to establish that the Employee's work activities did not merely increase the pain in his hands, but advanced the severity of his pre-existing arthritic condition. To the extent that reasonable doubt may exist on this point, our law requires an interpretation favorably to the Employee. *E.g., Wilhelm,* 235 S.W.3d at 127. That view is consistent, of course, with the remedial nature of the Workers' Compensation Act.[5]

For the reasons that the Employer argued the claim was not compensable, the Employer contends that the trial court erred by awarding temporary total benefits for missed work as the result of the surgeries to each hand. The Employer also maintains that the award of 40% to each hand was excessive. We have determined that neither of these arguments has merit. Finally, the Employee contends for the first time in this Court that the trial court's judgment mistakenly awarded 120 weeks of benefits rather than 160 weeks of benefits, and that the judgment should be corrected. This is an issue of fact and was never brought to the trial court's attention. Upon remand, the Employee may direct the merits of this claim to the trial court.

### Conclusion

In this instance, the trial judge, having seen the Employee and heard his testimony first hand, was in the best position to evaluate credibility. Because the medical evidence does not preponderate against the finding of causation and the award of benefits, we reverse the decision of the Appeals Panel. The case is remanded for any further proceedings which may be necessary. Costs on appeal are assessed against the Employer, Armstrong Woods Products, for which execution may issue if necessary.

WILLIAM C. KOCH, JR., J., dissenting.

---

5. "Tennessee Code Annotated section 50–6–116 declares the Workers' Compensation statute to be remedial in nature, and directs that the statute 'shall be given an equitable construction by the courts, to the end that the objects and purposes of this chapter may be realized and attained.' Accordingly, these laws should be rationally but liberally construed to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage." *Martin v. Lear Corp.,* 90 S.W.3d 626, 629 (Tenn.2002) (citations omitted).

WILLIAM C. KOCH, JR., J., dissenting.

The Court in this case has reversed the holding of the Special Workers' Compensation Appeals Panel that Mr. Trosper failed to prove that his preexisting osteoarthritis was permanently worsened by work he performed in the winter of 1997–1998. Based on a selective review of the evidence, the Court has concluded that Mr. Trosper is entitled to workers' compensation benefits because his work "advanced the severity" of his osteoarthritis. I respectfully disagree that Mr. Trosper has carried his burden of proof in this case.

## I.

Mr. Trosper went to work for Armstrong Wood Products in 1993 when he was approximately fifty-one years old. At that time, he had osteoarthritis in his hands, feet, back, and knees, although he apparently did not know it because the disease was asymptomatic. In the winter of 1997–1998, Mr. Trosper was assigned to work outdoors moving heavy boards by hand. This work activity caused him to experience pain in both hands at the base of his thumbs. He asked to be moved to another job, and, in the spring of 1998, his employer moved him to another job inside the plant that involved less stress on his hands.

Mr. Trosper was able to perform his new job and did not experience any further difficulty with his hands or seek any medical treatment for his hands. He was moved to another job inside the plant in 2000 or 2001. Mr. Trosper characterized his new job as "easier," even though it required him to lift between seven and twelve heavy buckets of material during his shift and to pour the contents of the buckets into a hopper. He was apparently able to perform this job without difficulty until June 2004. Within a month or two after returning to work following a recovery from an unrelated injury to his knee,[1] Mr. Trosper began to experience pain in his hands when he lifted the buckets of material.

Dr. Cletus McMahon examined Mr. Trosper and diagnosed him with bilateral carpometacarpal osteoarthritis in both hands at the base of his thumbs. In October 2004, Dr. McMahon performed a surgical fusion of the joint at the base of Mr. Trosper's right thumb. Mr. Trosper returned to work; however, he experienced similar pain in his left hand. Accordingly, Dr. McMahon performed a surgical fusion on Mr. Trosper's left thumb in June 2005. Mr. Trosper retired following the second surgery.

In July 2005, Mr. Trosper filed a complaint in the Chancery Court for Scott County seeking workers' compensation benefits. He alleged that the "repetitive nature of handling lumber and wood products" in the winter of 1997–1998 caused work-related injuries that necessitated the 2004 and 2005 surgeries on his hands. Mr. Trosper did not rely on Dr. McMahon, his treating physician, to substantiate his claim. Instead, he retained Dr. William E. Kennedy to provide the necessary expert opinion that Mr. Trosper's work-related activities caused his disability. Dr. Kennedy examined Mr. Trosper for the first time in March 2006, almost eight years after the onset of his symptoms and one year after Mr. Trosper's last wrist surgery, and concluded that Mr. Trosper's condition was caused by his work. On March 20, 2007, the trial court, relying on Dr. Kennedy's testimony, determined that Mr. Trosper had sustained a compensable injury resulting in a forty percent vocational disability in each hand.

---

1. A fall from a forklift required Mr. Trosper to undergo knee replacement surgery.

Armstrong Wood Products appealed, and we assigned the case to the Special Workers' Compensation Appeals Panel. Armstrong Wood Products took issue with the trial court's conclusion that Mr. Trosper's work had aggravated his preexisting osteoarthritis. It also challenged the award for temporary total disability benefits and insisted that the forty percent vocational disability award was excessive. On May 9, 2008, the Appeals Panel unanimously reversed the trial court. The Appeals Panel explained:

> Our examination of this evidence leads us to the conclusion that Mr. Trosper failed to carry his burden of proof in this matter. All of the doctors agreed that the underlying condition was not caused by his [Mr. Trosper's] employment. They also agreed that the condition was progressive. There was a six-year gap between the events alleged to have caused a compensable aggravation of Mr. Trosper's arthritis and his initial report to Armstrong. Dr. Kennedy's examination, upon which the trial court relied, occurred two years after that. There were no medical records or other supporting evidence concerning Mr. Trosper's arthritis during the period of time between 1998 and 2004. This combination of factors renders Dr. Kennedy's opinion speculative, at best.

Dr. Kennedy's opinion, which the Appeals Panel characterized as "speculative, at best" has become the cornerstone of this Court's opinion.

## II.

Arthritis is not a single disease. It is actually an umbrella term used for a group of more than one hundred medical conditions that collectively affect nearly forty-six million adults and three hundred thousand children in America alone.[2] While the common symptoms of these conditions are pain on motion, stiffness and swelling in one or more joints,[3] each condition has different causes, prognoses, and treatments. Judicial decisions regarding arthritic conditions are very fact-sensitive.

Osteoarthritis (also known as degenerative arthritis) is the most common form of arthritis.[4] It afflicts nearly twenty-seven million Americans each year.[5] It is a chronic, inflammatory condition of the joints that is characterized by destruction of cartilage,[6] overgrowth of bone, and impaired function.[7]

The onset of osteoarthritis tends to be gradual, beginning with short-lived periods of stiffness in its early stages. Later, persons with osteoarthritis experience pain when moving the affected joint. This pain worsens with prolonged activity and is re-

**2.** Arthritis Foundation, *What is Arthritis?*, *available at* http://www.arthritis.org/what-is-arthritis.php (last visited Dec. 15, 2008).

**3.** 13 Roscoe N. Gray & Louise J. Gordy, *Attorneys' Textbook of Medicine* ¶ 176.31 (3d ed. 2001) (*"Attorneys' Textbook of Medicine"*).

**4.** 13 *Attorneys' Textbook of Medicine* ¶ 176.31(2).

**5.** Charles G. Helmick et al., *Estimates of the Prevalence of Arthritis and Other Rheumatic Conditions in the United States, Pt. II*, 58 Arthritis & Rheumatism 15–25 (Jan.2008).

**6.** 13 *Attorneys' Textbook of Medicine* ¶ 176.31(2); *see also Cunningham v. Goodyear Tire & Rubber Co.*, 811 S.W.2d 888, 892 (Tenn.1991) (Daughtrey, J., dissenting) (summarizing a testifying rheumatologist's description of osteoarthritis as "a form of arthritis, the cause of which is unknown, but is manifested primarily by a deterioration of the cartilages in the joints to the extent that the cartilages lose their ability to properly cushion or pad the joint").

**7.** 6 *Attorneys' Textbook of Medicine* ¶ 19B.00.

lieved with rest.[8] The prognosis for persons with osteoarthritis is variable, depending on the extent and location of the disease.[9] In his deposition filed in this case, Dr. Ronald J. Fadel explained that arthritis

> can be static for long periods of time, followed by acute inflammatory or periods of inflammation, and highly symptomatic, followed then by remission. But generally, over the course of a lifetime, and the longer someone lives and the more likely this is, they tend to slowly get—get worse.

None of the other testifying physicians disagreed with Dr. Fadel's description of the usual course of osteoarthritis.[10]

Because "arthritis" is not one but many conditions that have different causes, prognoses, and treatments, decisions regarding one type of arthritis cannot necessarily be generalized to apply to other types of arthritis. These cases are highly fact-sensitive, and thus lay persons, like judges and lawyers, should guard against making over-broad generalizations that lack specific support from medical experts with regard to a specific arthritic condition.

## III.

Pain is the most common symptom that patients report to healthcare providers.[11] In today's medical and legal context, pain is "first and foremost a bodily sensation" [12] caused by injury or illness.[13] Medical clinicians and researchers frequently define "pain" as "[a]n unpleasant and emotional experience associated with actual or potential tissue damage or described in terms of such damage." [14] Pain functions as a warning symptom alerting the injured person to take notice and to properly care for an injury or illness.[15] A "symptom" is any deviation from normal form, function, or appearance experienced by a person and

---

**8.** 13 *Attorneys' Textbook of Medicine* ¶ 176.31(2).

**9.** 6 *Attorneys' Textbook of Medicine* ¶ 19B.70.

**10.** Another text explains that "[t]he onset of osteoarthritis tends to be gradual, beginning with short-lived periods of stiffness in the early stages. Later, patients experience pain when moving the affected joint, made worse by prolonged activity and relieved with rest. Limitation of motion is common, and bony enlargement may be prominent. Systemic symptoms, as in rheumatoid arthritis, are absent, as is ankylosis (fixation or stiffening of a joint). Diagnosis is by x-ray, which may show shrunken joints, calcification at the ends of bones, and bone spurs." 13 *Attorneys' Textbook of Medicine* ¶ 176.31(2).

**11.** Taber's Cyclopedic Medical Dictionary 1566 (20th ed 2005) ("Taber's Cyclopedic Medical Dictionary"); Jyotsna Nagda & Zahid H. Bajwa, *Definitions and Classification of Pain*, in Carol A. Warfield & Zahid H. Bajwa, *Principles and Practice of Pain Medicine* 51 (2d ed.2004).

**12.** Shai J. Lavi, *The Problem of Pain and the Right to Die*, in *Pain, Death and the Law* 145 (Austin Sarat ed., 2004).

**13.** II The Oxford Companion to Medicine 991 (John Walton et al. eds., 1986); Jose Kuri et al., *The Spine at Trial: Practical Medicolegal Concepts About the Spine* 107 (2002).

**14.** John D. Loeser & Rolf–Detlef Treede, *The Kyoto Protocol of IASP Basic Pain Terminology*, 137 Pain 473, 475 (2008) ("Loeser & Treede"). The International Association for the Study of Pain ("IASP") is a group of clinicians and researchers that is widely considered to be a leader in pain and pain management. Martin V. Totaro, Note, *Modernizing the Critique of Per Diem Pain and Suffering Damages*, 92 Va. L.Rev. 289, 304–05 (2006).

**15.** 13 *Attorneys' Textbook of Medicine* ¶ 176.00; 3 Dan J. Tennenhouse, *Attorneys' Medical Deskbook* § 22:1 (3d ed. 1993) ("*Attorneys' Medical Deskbook*") (pain is a "message that something is wrong"); Carol A. Warfield & Zahid H. Bajwa, *Principles and Practice of Pain Medicine*, Preface, at xxi (2d ed.2004).

thought to indicate some underlying injury or illness.[16]

Pain is a complex interaction of sensory, emotional, and behavioral factors.[17] It is a personal, subjective experience.[18] Individuals experience pain differently because of significant differences in their pain thresholds and tolerance to pain, their response to medications, and their susceptibility to clinical pain syndrome.[19] Many factors influence a person's experience of pain, including: (1) the nature of the person's injury or illness, (2) the person's physical and emotional health, (3) the acuity or chronicity of the person's symptoms, (4) the person's social milieu or cultural upbringing, (5) the person's neurochemistry, (6) the person's memory, and (7) the person's personality.[20]

## IV.

The courts have not devised a crystal clear test for determining whether an employee's work-related activities have contributed to the permanent acceleration or worsening of the employee's disability. This inquiry has proved to be particularly difficult in cases where the employee's preexisting condition is some type of arthritis. Because of the progressively debilitating nature of this disease, it is difficult to articulate objective rules for determining whether the condition for which the employee seeks workers' compensation benefits was caused by the natural progression of the arthritis or whether the employee's work-related activities accelerated or substantially contributed to the employee's condition.

Employees are not entitled to workers' compensation benefits for the effects of the aging process or for the progression of illnesses or diseases that are not work-related. *Jose v. Equifax, Inc.*, 556 S.W.2d 82, 84 (Tenn.1977). The right to receive workers' compensation benefits arises only when the employee has sustained a "personal injury ... by accident arising out of and in the course of employment."[21] Tenn.Code Ann. § 50–6–103(a) (2008); *see also Curtis v. G.E. Capital Modular Space*, 155 S.W.3d 877, 882 (Tenn.2005); *W.S. Dickey Mfg. Co. v. Moore*, 208 Tenn. 576, 581, 347 S.W.2d 493, 495 (1961). By statute, a "personal injury" is an "injury by accident ... that causes disablement ... of an employee," including "occupational diseases" and "mental injuries."[22]

**16.** John D. Loeser, *Pain as a Disease*, 81 Handbook on Clinical Neurology 11, 15 (Fernando Cervero & T.S. Jensen eds, 2006). While not disagreeing that pain may be characterized as a symptom of injury or illness, the IASP currently endorses the concept that, in some circumstances, chronic pain (sometimes referred to as "chronic pain syndrome") should itself be considered to be a disease. Loeser & Treede, 137 Pain at 473, 475.

**17.** 13 *Attorneys' Textbook of Medicine* ¶ 176.00; Herta Flor & Dennis C. Turk, *Cognitive and Learning Aspects*, in *Wall and Melzack's Textbook of Pain* 241 (Stephen McMahan & Martin Koltzenburg eds., 2005) ("*Wall and Melzack's Textbook of Pain* ").

**18.** Ronald Melzack & Patrick D. Wall, *The Challenge of Pain* 27–28, 99 (1982); Ronald Melzack & Joel Katz, *Pain Assessment in Adult Patients*, in *Wall and Melzack's Textbook of Pain*, at 291; Int'l Ass'n for the Study of Pain, *Pain Terms: A List with Definitions and Notes on Usage*, 6 Pain 247, 249–52 (1979); 3 *Attorneys' Medical Deskbook* § 22:6.

**19.** Jeffrey S. Mogil & Mitchell B. Bax, *The Genetics of Pain*, in *Wall and Melzack's Textbook of Pain*, at 159.

**20.** Taber's Cyclopedic Medical Dictionary 1566.

**21.** This case does not involve the work-related death of an employee.

**22.** "Mental injuries" are defined in Tenn. Code Ann. § 50–6–102(15).

Tenn.Code Ann. § 50–6–102(12). This Court has characterized a compensable workers' compensation injury as "whatever lesion or change in any part of the system that produces harm or pain or lessened facility of the natural use of any bodily activity or capacity." *Fritts v. Safety Nat'l Casualty Corp.*, 163 S.W.3d 673, 680 (Tenn.2005); *Brown Shoe Co. v. Reed*, 209 Tenn. 106, 113, 350 S.W.2d 65, 69 (1961); *see also Fink v. Caudle*, 856 S.W.2d 952, 958 (Tenn. Workers' Comp. Panel 1993).[23]

The factual complexity engendered by a workers' compensation claim that involves preexisting conditions has provided analytical challenges for the courts. Professor Larson characterizes these types of cases as "mixed risk" cases—ones in which a personal cause and an employment-related cause combine to produce an injury. 1 *Larson's Workers' Compensation Law* § 4.04.[24] In circumstances involving mixed risks, Professor Larson states that "[t]he law does not weigh the relative importance of the two causes, nor does it look for primary or secondary causes, it merely inquires whether the employment was a contributing factor. If it was, the concurrence of the personal cause will not defeat compensability." 1 *Larson's Workers' Compensation Law* § 4.04; *Fink v. Caudle*, 856 S.W.2d at 958 (holding that "an injury is compensable, even though the claimant may be suffering from a preexisting condition or disability, if a work-connected accident can be fairly said to be a contributing cause of such injury").

Analysis of a mixed risk case rests on the principle that for the purpose of workers' compensation benefits, an employer takes its employees as it finds them. *Fritts v. Safety Nat'l Casualty Corp.*, 163 S.W.3d at 679; *Hollingsworth v. S & W Pallet Co.*, 74 S.W.3d 347, 357 (Tenn.2002). Thus, this Court has long recognized that an employee is entitled to workers' compensation benefits if the employee's work causes an actual progression or advances[25] a preexisting condition or disease. *Barnett v. Milan Seating Sys.*, 215 S.W.3d 828, 835 (Tenn.2007); *Fritts v. Safety Nat'l Casualty Corp.*, 163 S.W.3d at 679; *Hill v. Eagle Bend Mfg., Inc.*, 942 S.W.2d 483, 488 (Tenn.1997); *Talley v. Virginia Ins. Reciprocal*, 775 S.W.2d 587, 591 (Tenn.1989); *Baxter v. Smith*, 211 Tenn. 347, 361, 364 S.W.2d 936, 942–43 (1962).[26] However,

---

**23.** In more modern parlance, a "personal injury" for the purpose of a workers' compensation claim "includes any harmful change in the body. It need not involve physical trauma, but may include such injuries as disease, sunstroke, nervous collapse, traumatic neurosis, hysterical paralysis, and neurasthenia." 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* ch. 55, Scope (2008) ("*Larson's Workers' Compensation Law*").

**24.** Professor Larson's treatise points out that the "most common example [of a mixed risk] is that of a person with a weak heart who dies because of strain occasioned by employment." 1 *Larson's Workers' Compensation Law* § 4.04. In that vain, this Court has upheld a workers' compensation award to an employee with a preexisting heart condition who experienced a heart attack precipitated by physical exertion or strain at work. *Clark*

*v. Nashville Mach. Elevator Co.*, 129 S.W.3d 42, 47 (Tenn.2004).

**25.** In its holdings on this subject, this Court has employed other verbs such as "aggravate," "accelerate," "exacerbate," and "excite." *Thomas v. Aetna Life & Casualty Co.*, 812 S.W.2d 278, 284 (Tenn.1991); *Swift & Co. v. Howard*, 186 Tenn. 584, 591–92, 212 S.W.2d 388, 391–92 (1948).

**26.** We have also held that an employee is entitled to workers' compensation benefits when his work-related activities aggravate a pre-existing condition that causes another disabling condition. *Townsend v. State*, 826 S.W.2d 434, 436 (Tenn.1992); *Smith v. Smith's Transfer Corp.*, 735 S.W.2d 221, 225–26 (Tenn.1987). A Maryland treatise on workers' compensation law illustrates this circumstance as follows: "[I]f an employee

since the earliest days, this Court has also recognized that compensability under the workers' compensation statutes must be based on changes in the employee's underlying condition, not changes in the symptoms of the employee's underlying condition.

Tennessee's courts have consistently viewed pain as a symptom of an underlying condition, rather than as a condition itself.[27] Accordingly, as early as 1969, this Court declined to award workers' compensation benefits to an employee whose work activities "aggravated" the pain of her preexisting cervical neuritis and degenerative arthritis. The Court held that "making the pain [of a preexisting condition] worse" is not a compensable accident. *Boling v. Raytheon Co.*, 223 Tenn. 528, 534, 448 S.W.2d 405, 408 (1969).

We employed the same reasoning seventeen years later when we declined to award workers' compensation benefits to an employee whose work caused increased pain from her congenital thoracic outlet syndrome. Citing *Boling v. Raytheon Company*, we noted that the employee's work activities "aggravated her preexisting condition by making the pain worse but it did not otherwise injure or advance the severity of her thoracic outlet syndrome or result in another disabling condition."

*Smith v. Smith's Transfer Corp.*, 735 S.W.2d at 225–26.

With some inconsequential differences in wording, Tennessee courts have consistently continued to recognize that an increase in pain with no actual progression or advancement of the underlying condition is not compensable. *Barnett v. Milan Seating Sys.*, 215 S.W.3d 828, 835 (Tenn. 2007); *Tobitt v. Bridgestone/Firestone, Inc.*, 59 S.W.3d 57, 62 (Tenn.2001); *Hill v. Eagle Bend Mfg., Inc.*, 942 S.W.2d 483, 488 n. 1. (Tenn.1997); *Townsend v. State*, 826 S.W.2d at 436; *Cunningham v. Goodyear Tire & Rubber Co.*, 811 S.W.2d 888, 891 (Tenn.1991); *Mathenia v. Milan Seating Sys.*, 254 S.W.3d 313, 319 (Tenn.Workers Comp.Panel 2007); *Sweat v. Superior Indus., Inc.*, 966 S.W.2d 31, 32–33 (Tenn.Workers Comp.Panel 1998). However, we have also continued to recognize that an employer is required to pay workers' compensation benefits if any employee's work activities cause an actual, progression, advancement, or acceleration of a preexisting condition that results in disabling pain. *White v. Werthan Indus.*, 824 S.W.2d 158, 160–61 (Tenn.1992); *Talley v. Virginia Ins. Reciprocal*, 775 S.W.2d at 592; *Fink v. Caudle*, 856 S.W.2d at 958–59.

Evidence that a preexisting condition has progressed, advanced, or accelerated

---

previously fractured their wrist and developed arthritis as a result, then aggravates the arthritis by writing a treatise on workers' compensation, the aggravation is not compensable. However, if the employee develops carpal tunnel syndrome from constant and prolonged keyboard use, that: (1) is aggravated by the preexisting arthritis; or (2) aggravates the preexisting arthritis[,] the carpal tunnel syndrome may well be compensable if the hazards of it exist in the employment." 1 Clifford B. Sobin, *Maryland Practice: Workers' Compensation* § 7:6 (2008).

27. On two occasions, a Tennessee court has awarded workers' compensation benefits to

an employee diagnosed with chronic pain syndrome. *Fritts v. Safety Nat'l Casualty Corp.*, 163 S.W.3d at 681; *Russell v. Thyssenkrupp Elevator Mfg., Inc.*, No. W2004–01472–SC–WCM–CV, 2005 WL 3201034, at *5 (Tenn.Workers Comp.Panel Nov.29, 2005). In another case, an employee with chronic pain syndrome was denied workers' compensation benefits because it was not caused by a work-related injury. *Osborne v. State Indus., Inc.*, No. M2001–01288–WC–R3–CV, 2002 WL 1284466, at *4 (Tenn.Workers Comp.Panel June 12, 2002). This case does not involve an employee who has been diagnosed with chronic pain syndrome.

may take different forms. One of the most common ways to prove the progression of an preexisting condition is to present competent evidence of a physical or anatomical change. *See, e.g., Kroger Co. v. Johnson,* 221 Tenn. 649, 651, 430 S.W.2d 130, 131 (1967) (denying workers' compensation benefits to an employee who could not prove an "actual physical change in his feet"). However, we have never held that proving the existence of an anatomical or physical change is the only way to establish that work-related activities caused a progression in an employee's preexisting condition. To the contrary, we have stated consistently that employees are entitled to workers' compensation benefits when they prove that their work-related activities caused a disability either by producing an anatomic or physical change in the employee or by causing a preexisting condition to get worse (that is, to progress, advance, or accelerate). *Fritts v. Safety Nat'l Casualty Corp.,* 163 S.W.3d at 679; *Tobitt v. Bridgestone/Firestone, Inc.,* 59 S.W.3d at 62; *Cunningham v. Goodyear Tire & Rubber Co.,* 811 S.W.2d at 890; *Smith v. Smith's Transfer Corp.,* 735 S.W.2d at 224–26.[28]

28. The complexity of these cases is often increased by the difficulty of explaining medical diagnoses or opinions in a way that lawyers and judges can understand them. As one physician testifying in a workers' compensation case observed, "it's easy to explain to myself medically what happened. It is not nearly so easy to explain to you legally what happened." *White v. Werthan Indus.,* 824 S.W.2d at 160. The ability of courts to reach a fair and just result is also hindered when medical experts are asked for an opinion but are not asked to provide a precise explanation regarding the basis for their opinion.

29. In several cases, physicians have circumvented the necessity of demonstrating that there has been a progression, advancement, or acceleration of a preexisting condition by testifying that the pain itself is evidence of an anatomical or physical change, even though they could not explain what that change was.

Thus, Tennessee law, as it currently stands, recognizes an important factual distinction when an employee seeks workers' compensation benefits based on pain caused by working. An employee whose disabling pain is caused by a work-related injury is entitled to workers' compensation benefits. However, an employee whose work-related activities caused his or her preexisting condition to be more painful is not entitled to workers' compensation benefits without proof that the employee's work-related activities caused the employee's underlying condition to progress, advance, or accelerate.[29]

## V.

The determinative question in this case is whether Mr. Trosper has presented sufficient competent evidence to establish that the work he was performing during the winter of 1997–1998 caused an aggravation or advancement of his preexisting osteoarthritis. The foundation of Mr. Trosper's case is Dr. Kennedy's testimony. Like the judges on the Special Workers' Compensation Appeals Panel, I have concluded that Dr. Kennedy's testimony regarding the

*See, e.g., Mathenia v. Milan Seating Sys.,* 254 S.W.3d at 319 (the physician testified "that to have increased pain, something has to change anatomically to cause that pain if we have got a stable person who is not faking"); *Denny v. Norwalk Furniture Corp.,* No. M2004–02661–WC–R3–CV, 2005 WL 2381886, at *5 (Tenn.Workers Comp.Panel Sept.28, 2005) (the physician testified that "if he was not having any pain prior to [the 2002 incidents] and was having severe pain afterwards that there had to be some kind of change, be it microscopic, hormonal, chemical, that would produce increased symptomology"). This sort of tautological testimony regarding increased symptomology without testimony about its cause is simply too speculative to provide a basis for an opinion regarding the causation of a compensable disabling condition.

causal relationship between Mr. Trosper's work activities in the winter of 1997–1998 and his current disability is simply too speculative and imprecise to support an award of workers' compensation benefits.

## A.

Employees seeking workers' compensation benefits have the burden of proving every element of their claim by a preponderance of the evidence. *Fitzgerald v. BTR Sealing Sys. N. Am.—Tenn. Operations,* 205 S.W.3d 400, 404 (Tenn.2006); *Vinson v. United Parcel Serv.,* 92 S.W.3d 380, 385 (Tenn.2002). Except in the most obvious cases, they must present expert medical evidence to establish that their injury was caused by their work-related activities. *Glisson v. Mohon Int'l, Inc./Campbell Ray,* 185 S.W.3d 348, 354 (Tenn.2006); *Fritts v. Safety Nat'l Casualty Corp.,* 163 S.W.3d at 678. However, the expert evidence need not be considered in a vacuum. It may be considered in light of relevant lay testimony, *White v. Werthan Indus.,* 824 S.W.2d at 159, including the employee's testimony. *Eads v. GuideOne Mut. Ins. Co.,* 197 S.W.3d 737, 741 (Tenn.2006); *Smith v. Empire Pencil Co.,* 781 S.W.2d 833, 835 (Tenn.1989). ·

Medical experts testifying in workers' compensation cases are not required to render their opinions with absolute medical certainty. *Glisson v. Mohon Int'l, Inc./Campbell Ray,* 185 S.W.3d at 354; *Saylor v. Lakeway Trucking, Inc.,* 181 S.W.3d 314, 320 (Tenn.2005); *Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn.1991). Reasonable doubts should be resolved in the employee's favor. *Clark v. Nashville Mach. Elevator Co.,* 129 S.W.3d 42, 47 (Tenn.2004); *Hill v. Eagle Bend Mfg., Inc.,* 942 S.W.2d at 487. However, an expert's opinion regarding causation cannot be so speculative or equivocal that attributing the employee's injury to

his or her employment would be an arbitrary determination or a mere possibility. *Tobitt v. Bridgestone/Firestone, Inc.,* 59 S.W.3d at 61; *Woodlawn Mem'l Park, Inc. v. Keith,* 70 S.W.3d 691, 695–96 (Tenn. 2002) (quoting *Tindall v. Waring Park Ass'n,* 725 S.W.2d 935, 937 (Tenn.1987)).

As with other non-jury civil cases, reviewing courts must defer to a trial court's determination of the weight of the testimony of experts who testify in person. *Gray v. Cullom Mach. Tool & Die, Inc.,* 152 S.W.3d 439, 442 (Tenn.2004); *Carter v. First Source Furniture Group,* 92 S.W.3d 367, 370 (Tenn.2002). However, they should not afford the same deference with regard to a trial court's conclusions with regard to the weight of an expert's deposition testimony. *Barron v. State Dep't of Human Servs.,* 184 S.W.3d 219, 221 (Tenn. 2006). In that circumstance, the reviewing court should review the record de novo, make its own assessment of the medical proof, and draw its own conclusions regarding the weight and credibility of the expert's opinions. *Fritts v. Safety Nat'l Casualty Corp.,* 163 S.W.3d at 679; *Conner Bros. Excavating Co. v. Long,* 98 S.W.3d 656, 660 (Tenn.2003).

## B.

Because all the expert medical testimony in this case was introduced through depositions, we must review the record independently, and we must reach our own conclusions regarding the weight and sufficiency of Dr. Kennedy's causation testimony. To do so, we must first ascertain precisely what Dr. Kennedy's testimony was. Despite the ambiguity of the Court's opinion on this point, the record presents Dr. Kennedy's opinion in clear, understandable terms.

In both his deposition testimony and in the written report of his independent medical evaluation, Dr. Kennedy states that

the event that triggered Mr. Trosper's claim for workers' compensation benefits occurred during the winter of 1997–1998 while Mr. Trosper was working as a lumber stacker.[30] Consistent with the allegations in Mr. Trosper's complaint, he testified that "the work as a lumber stacker during the winter of 1997 and '98 permanently aggravated and advanced the preexisting underlying carpometacarpal osteoarthritis in both thumbs and caused the painful instability of those joints which ultimately necessitated the surgery performed by Dr. Cletus McMahon [in 2004 and 2005]." Dr. Kennedy also concluded that between 1998 and 2004, the aggravation of the injury sustained in the winter of 1997–1998 was "intermittent rather than constant or continuous." Based on these findings, Dr. Kennedy opined: "[m]ore likely than not, had it not been for the cumulative trauma of his work at Triangle Pacific,[31] he [Mr. Trosper] would not have required surgery, and his arthritis, with its subluxation,[32] would not have been advanced or aggravated to the extent it was."

Dr. Kennedy's testimony that Mr. Trosper's disabling condition in 2005 was caused by this work activities rather than by the natural advancement of his preexisting osteoarthritis is undermined by three concessions that Dr. Kennedy himself made. First, Dr. Kennedy, conceded that he had never treated Mr. Trosper and that he had not reviewed medical records or x-rays taken prior to 2004. Accordingly, Dr. Kennedy was unable to ascertain the extent of the osteoarthritis in Mr. Trosper's wrists at the time he experienced the first onset of pain during the winter of 1997–1998 and had no basis to opine how much Mr. Trosper's osteoarthritis progressed between the winter of 1997–1998 and 2004.

Second, Dr. Kennedy acknowledged that Mr. Trosper had continued to work for approximately six years after the onset of the pain in his wrists without reporting continuing pain or seeking medical treatment. This extended period without reports of pain calls into question the disabling nature or the permanency of any injury that Mr. Trosper might have sustained during the winter of 1997–1998. Third, Dr. Kennedy conceded on cross-examination that, in the final analysis, he was unable to differentiate between the effects on Mr. Trosper's condition in 2005 of his naturally progressing osteoarthritis and the "cumulative trauma" of his work.[33]

---

30. In his written report dated March 20, 2006, Dr. Kennedy stated that Mr. Trosper's onset of symptoms ("pain in and subluxation of the carpometacarpal joints in both thumbs") occurred while working as a lumber stacker during the winter of 1997–1998. Dr. Kennedy repeated this conclusion in his deposition testimony when he testified: "[h]e [Mr. Trosper] told me that those symptoms occurred after he had been working for several weeks as a[sic] outdoor lumber stacker."

31. For the purposes of this case, the parties and the trial court treated Triangle Pacific and Armstrong Wood Products as the same entity.

32. "Subluxation" refers to the displacement of a bone within a joint where the bone is still touching the joint surface but is no longer in its normal anatomic relationship. 2 *Attorneys' Medical Deskbook* § 16:5.

33. Dr. Kennedy testified:

We really cannot distinguish in most cases between the post-traumatic changes resulting in cumulative trauma and the disease process itself, other than by understanding the history, as in this case, and understanding the ways that the particular tasks involved would, with reasonable medical certainty, have caused extraordinary or unusually severe forces to be conducted repeatedly through the thumb. We really cannot distinguish between the post-traumatic aspects of cumulative trauma or the results of cumulative trauma and the disease process itself.

The Court has chosen not to address the significance of Dr. Kennedy's concession that he could not distinguish between the effects of the cumulative trauma of Mr. Trosper's job and the effect of Mr. Trosper's naturally progressing osteoarthritis.[34] In my mind, however, the concession renders Dr. Kennedy's opinion regarding the causation of Mr. Trosper's disability equivocal and speculative. Even viewing the evidence in the light most favorable to Mr. Trosper, Dr. Kennedy's testimony cannot provide the foundation of a principled decision to award Mr. Trosper workers' compensation benefits. Accordingly, I concur with the Special Workers' Compensation Panel's conclusion that Dr. Kennedy's opinion was "speculative, at best" and, therefore, that Mr. Trosper failed to carry his burden of proof.

---

34. The Court instead places great reliance on Mr. Trosper's testimony regarding the nature of his symptoms from and after 2004. It is obvious that Mr. Trosper is not qualified to address the question regarding whether his work-related activities caused his pre-existing osteoarthritis to permanently worsen. Thus, his truthful testimony regarding his symptoms does little to shore up the analytical shortcomings in Dr. Kennedy's testimony.